IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

MICHAEL VALLEJOS,

        Petitioner,

v.                                                     CIV 02-164 WJ/KBM

JOE WILLIAMS, Warden, et al.

        Respondents.

# PROPOSED FINDINGS AND RECOMMENDED DISPOSITION

Petitioner Michael Vallejos ("Defendant" or "Vallejos") was convicted in state court of various offenses surrounding the attempted murder of his son's friend Sybil Saiz ("Saiz"). Following exhaustion of his state court remedies, he filed this action seeking a petition for a writ of habeas corpus under 28 U.S.C. § 2254. *Doc 1.* Thereafter, I required Respondents to file the record proper.

Because Vallejos filed after the effective date of Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), its standards[1] apply to this case. *E.g., Paxton v. Ward,* 199 F.3d 1197, 1204 (10th Cir. 1999). All of the issues can be resolved on the record, such that an evidentiary hearing is unnecessary. *E.g., Trice v. Ward,* 196 F.3d 1151, 1159 (10th Cir. 1999), *cert. denied,* 531 U.S. 835 (2000); Rule 8(a), *Rules Governing Habeas Corpus Under*

---

[1] Under AEDPA standards, a federal court cannot grant a writ of habeas corpus unless: (1) the state court decision is "contrary to, or involved an unreasonable application of . . . Supreme Court" precedent; or (2) is "an unreasonable determination of the facts in light of the evidence presented." 28 U.S.C. §§ 2254(d)(1)-(2); *see also Williams v. Taylor,* 529 U.S. 362 (2000); *Van Woudenberg v. Gibson,* 211 F.3d 560, 566 & n. 4 (10th Cir. 2000), *cert. denied,* 531 U.S. 1161 (2001).

*Section 2254.*  The tapes of the state court proceedings have been reviewed,[2] and I have considered the entire state court record and the parties' arguments.  Based on that independent review, I find the petition is exhausted and recommend that it be denied as procedurally defaulted.

## I.  Factual Background

### A.  *Shooter Implicates Defendant After Pleading Guilty And Receives Reduced Sentence*

On January 20, 1996, Sybil Saiz ("Saiz") was shot while working at Taco Bell.  The gunman, Christopher Sedillo ("Sedillo"), walked into the restaurant and asked the manager for Saiz by name.  When Saiz came to the counter, Sedillo asked if she was Saiz and when she replied yes, he pulled out a gun and said "this is for you."  Saiz turned to run, slipped, and fell to the floor behind the counter.  Sedillo shot at her once as she tried to flee, and the bullet ricocheted off the counter and into her back.  The gun jammed, and Sedillo fled.  Saiz recovered, however, the bullet remains lodged near her spine.

Sedillo was arrested in April 1996 after his wife turned him in.  The victim identified him as the shooter from a photo array, and he was indicted on various charges.  Sedillo faced twenty-seven years imprisonment and refused to give a statement to the police.  Eventually he pleaded guilty in November 1986 under an agreement that called for twelve and one-half years imprisonment.  His attorney Raul Sedillo (no apparent relation), had shown his client all of the police reports and urged his client to accept the plea because the case against him was strong.

After Sedillo entered into the plea agreement, the officer continued to investigate the case and asked Sedillo's attorney if he could speak with his client.  They complied, and Sedillo gave a

---

[2]  Pin cites to the tapes are not included in my recitation of the facts as the use of different audio systems would inevitably result in different tape counts.  However, that the state log of the tapes is quite detailed and helpful in assisting where to locate testimony.

statement on January 28, 1997. According to Sedillo, the officer made no promises in exchange for the statement. To the contrary, the officer told Sedillo that he could not promise anything. Sedillo testified that despite his knowledge of the consequences of being labeled a "snitch," he proceeded to give his statement and at this point he implicated Defendant Vallejos, his uncle.

The officer prepared a complaint on February 3, 1997, and Defendant was arrested on February 14, 1997. *Record Proper* at 28. Sedillo was sentenced on February 20, 1997 under the terms of his plea agreement. The next day his attorney filed a motion to reconsider the sentence. The attorney testified that the reason he did so was because he was unsuccessful in persuading the prosecutor to suspend the sentence. Although Sedillo had a long history of drug and alcohol abuse and attempted rehabilitation several times to no avail, the attorney believed that the twelve-year sentence was excessive because his client was candid in his confession and desire to change, was a first time offender with no prior record at the time of the incident, and had a strong family support system and thus could be rehabilitated.

After the motion was filed, Sedillo agreed to testify before the grand jury about the Taco Bell shooting, according to him again with no promises of leniency in exchange for the testimony. Defendant Vallejos was then indicted on March 13, 1997, for attempted murder, conspiracy to commit murder, aggravated battery, conspiracy to commit aggravated battery, tampering with evidence, and criminal solicitation to commit murder Saiz. *Id.* at 1-4.

The subsequent hearing on the motion to reconsider Sedillo's sentence was audiotaped and played for the jury at Vallejos' trial. Among other grounds in support of a reduced sentence, Sedillo's attorney argued that his client had given testimony before the grand jury. The judge reduced Sedillo's sentence by four years, to a total of eight and one-half years on April 27, 1997.

With good behavior, Sedillo expected to be released in October 2000.

### B. The 1995 Feud & September 1996 Acquittals

The evidence against Vallejos consisted of circumstantial evidence of his motive for the shooting and Sedillo's testimony about Vallejos' direct involvement. For more than a year before the Saiz shooting, Defendant's son Michael Hurtado ("Hurtado") and Robert Castillo ("Castillo") were feuding with Saiz in the middle of the fracas. By October 1995, Saiz had been dating Castillo for about a year and according to her, she and Hurtado were merely friends. Saiz testified that she picked up Hurtado one night in October to take him to a party. On their way, they stopped at a convenience store to make a telephone call. As she was getting back into the car, Castillo drove up, jumped out of his car, began to punch Hurtado and bloodied his nose. When Castillo's pit bull became agitated and approached Saiz's car, Castillo gathered the dog and left. Saiz took Hurtado home. Castillo's testimony supports this version of the fight.

According to Sedillo and his mother, Maria Alvarado ("Alvarado"), when Defendant later described the incident, he embellished what had occurred. In the version related by Alvarado, Defendant told her that when Saiz and Hurtado were on a date, Castillo and two others had beaten up Hurtado with a baseball bat and turned the pit bull loose on him, resulting in bites to Hurtado's leg. According to Sedillo, Defendant told him that Saiz used Hurtado to try and make Castillo jealous, got Hurtado drunk and then took him to a predetermined location where Castillo and "his boys" beat Hurtado, let the pit bull take Hurtado by the throat, and abandoned Hurtado leaving him for dead.

Later that same night after the bloody nose incident, Saiz was at a McDonald's restaurant when Hurtado and his parents drove in. According to Saiz, when Vallejos asked where he could

find Castillo, she did not answer and drove off with Defendant following her to a Norwest bank.

Castillo, who was driving around with other friends, saw Saiz in the bank parking lot and pulled alongside her car. Before she could warn Castillo that Hurtado and his parents were in the other car, Vallejos started shooting. All three cars left the bank and went to a nearby park, where Vallejos started shooting again. Although no one was hurt that evening, Castillo was stopped and questioned by police about "shooting." Castillo testified that did not discuss the earlier incident. Hurtado and Defendant were later charged separately for the bank shooting incident.

Approximately one month after the bank shooting episode, Hurtado was critically injured in a drive-by shooting in front of his house. His family was fearful he would die. When Sedillo and Alvarado visited the hospitalized Hurtado, they spoke with Vallejos who was furious. During that time Defendant told them that in revenge for the bloody nose incident, he went shooting at Castillo and that he ultimately blamed Saiz for the shooting of Hurtado. For example, Alvarado testified that Defendant said: "that fuckin' bitch Sybil got my son shot and she's gonna fuckin' pay for this, she's not gonna get away with this;" "this was Sybil's fault; none of this would have ever happened if Sybil wouldn't have ever gone out with Mikey;" "that bitch is not going to get away with it, she and Robert are not going to get away with it, they're going to pay for what they've done to my son." Alvarado further testified that from a pay phone at the hospital, Defendant threatened "Sybil" saying "I'm gonna fuckin' kill you; you're fuckin' dead bitch" and then hung up the phone.

According to Sedillo's testimony, at the hospital he and Defendant kept their conversation to a minimum but did discuss seeking "revenge" against whomever shot Hurtado. Upon regaining consciousness, Hurtado cried and said to Sedillo, "Look at me." Vallejos then asked Sedillo,

"Are you down?" – slang for asking Sedillo if he was willing to go with Defendant to attain revenge. Sedillo responded, "Yes." Castillo would later testify that he was questioned about the Hurtado shooting and asserted that he was not involved. Castillo was not arrested for it and, based on the record before me, evidently no one was charged.

Approximately a year later, Hurtado went to trial on the bank shooting charges in September 1996. Judge William Sanchez presided over the jury trial, and Hurtado was represented by public defender George P. Eichwald. Castillo denied ever knowing who Hurtado was or having seen him before. Saiz testified and also did not identify him as involved in the incident, and Hurtado was acquitted.

Saiz was also unable to identify Vallejos, who was sitting in the back of the courtroom, at Hurtado's trial. Saiz would later testify that during Hurtado's trial, Defendant had changed his appearance in that he had more facial hair and was wearing sunglasses. She recounted that as she walked outside after Hurtado's trial, Vallejos "took off his glasses and he looked at me and I knew it was him." Following Hurtado's acquittal, the charges against Vallejos were dismissed.

### C. Defendant's Involvement In January 1997 Saiz Shooting

Judge Sanchez also presided over Defendant's trial for the Saiz shooting at the Taco Bell. Two weeks before the originally-scheduled trial date, Vallejos' retained counsel sought to withdraw, citing Defendant's "failure to comply with the terms of said representation and a lack of communication." *Record Proper* at 50. Judge Sanchez held a hearing, where Defendant was personally present. Among other things, counsel again cited a breakdown in "contractual terms" and indicated that he believed Defendant would qualify for public defender. He further stated that Defendant had been in contact with Mr. Eichwald and was scheduled to see him that afternoon if

the court granted the motion to withdraw.

During the course of the hearing, prosecution's comments seemed to assume that Mr. Eichwald was the attorney who would be substituted. Judge Sanchez therefore asked Vallejos if he had hired Mr. Eichwald. During the course of this inquiry, Defendant informed Judge Sanchez know that he had been in touch with Mr. Eichwald to ask if he could represent him. According to Defendant, Eichwald said he thought he could represent Vallejos, and had asked that Defendant let him know what "was going on."

Defendant reminded Judge Sanchez that Mr. Eichwald was the one who represented his son Hurtado in the bank shooting case previously before him. Vallejos also told Judge Sanchez that the prior shooting was related to the present case. Defendant's then-attorney advised Judge Sanchez that, given the prior related representation, there "may be a conflict." However, he added that Eichwald had not yet indicated that he believed representation of Defendant would pose any conflict.

Judge Sanchez advised Vallejos that if he was working, he might not qualify for public defender services. Moreover, even if he did qualify, he could not choose which of the four public defenders would represent him:

> Whichever attorney this court ends up appointing for you, you're stuck with that attorney and you have no choice as far as the public defender is concerned. You do have a choice if you hire an attorney. If you want to hire Mr. Eichwald to represent you, you can hire him to represent you . . . that's the beauty of hiring being able to hire your own attorney is because you get a choice of counsel. You decide who you want to represent you. But on public defender contract, I hate to say that you're stuck with that person, but that's the person you get.

Judge Sanchez would not allow withdrawal unless there was another attorney ready to substitute,

and advised Defendant to make financial arrangements with another attorney or have another attorney enter an appearance.

Thereafter, Judge Sanchez found Defendant indigent and appointed "George Eichwald/ C. Mercer" to represent him. *See Record Proper* at 94-95. There is no further discussion in the record concerning Eichwald's potential conflict. According to the trial tapes and the pleadings in the file, "C. Mercer"[3] never made an appearance as co-counsel with Mr. Eichwald. During voir dire, the only attorney introduced for Defendant was Mr. Eichwald.

At trial the prosecution had no physical evidence linking Defendant to the shooting because the gun was never recovered. The prosecution called a number of witnesses, including the restaurant patrons and employees who saw the shooting, as well as Saiz and Castillo. According to the investigating officer, the manager of the Taco Bell reported that a few days before the shooting, "people" in a blue or grey Nissan had "been looking" for Saiz. Castillo testified that he was sitting in his car in the parking lot on the day of the shooting. The above description of the car roughly matched Castillo's car and the car Sedillo drove. None of these witnesses saw Vallejos at the Taco Bell on the day in question.

Alvarado and Sedillo both testified about Defendant's comments while Hurtado was hospitalized. As mentioned above, these included blaming Saiz for Hurtado's injuries and desiring revenge. Contrary to her testimony during Hurtado's trial, Saiz now made a courtroom identification of Defendant as the person who shot at Castillo at the bank. However, Castillo failed to identify Vallejos as the bank shooter. On one hand, Castillo testified that he did not

---

[3] The 2001-2002 New Mexico Bar directory lists one attorney with the last name "Mercer." It is Cindy Mercer of the Michael Sanchez Law Offices PC in Los Lunas, New Mexico.

personally know Vallejos, had never seen him before, and only knew of him through Saiz. On the other hand, he admitted he was afraid of Vallejos because of the bank shooting but claimed that he did not get a good look at the man who was shooting.

Sedillo was the only person who testified about Defendant's direct involvement in the Saiz shooting. He testified that throughout the day in question, he and Vallejos were ingesting alcohol, crack cocaine and methamphetamine and Defendant was again recounting the history of the feud. The adrenaline was pumping as the conversation escalated and culminated in the suggestion "let's take care of it" and "stop this war." Sedillo explained "that's the way you do it" according to the way he was raised. Consistent with his acquiescence at the hospital, Sedillo left with Vallejos to carry the plan for Sedillo to actually do the shooting. The idea to go was "both of theirs."

They took off in Defendant's vintage and distinctive truck and drove to Taco Bell. On the way over, Defendant put a gun on the seat, offered Sedillo $80 or $100 cash, and promised "don't worry, I'll take care of you." At that time, Sedillo declined to take the cash, telling Defendant not to worry because Sedillo was willing to carry out the shooting as a matter of family pride. They went through drive-thru lane at Taco Bell and Defendant pointed out the person to shoot. When Defendant said "that's her," Sedillo "tripped out" because he wasn't expecting the target to be a girl – he thought they were going for Castillo and Sedillo had never met Saiz. In the restaurant he confirmed that the person who approached the counter was Saiz before he commenced shooting.

After the shooting, Sedillo ran out of the restaurant and returned to the spot where Defendant had dropped him off, but Defendant had left. Seeing the truck elsewhere, Sedillo got in and Defendant drove him back to Albuquerque. On the trip back, they talked about how the

event "went down," with Defendant wanting to confirm whether Saiz was "hit," "was down," and Sedillo replied he thought she was. Also during the trip, Sedillo took the money Vallejos had placed on the seat. Later that night, Sedillo took Defendant's truck home and when his wife refused to take the gun, Sedillo placed it under the seat in the truck. That was the last he saw of the gun, and Vallejos retrieved the truck the next morning.

The jury found Defendant guilty on all counts. After corrections made to the sentence following appeal, the trial court sentenced Defendant to a total of twenty-two and one-half years incarceration. *See Answer,* Exhs. A, I.[4]

## II. Exhaustion & Procedural Default

The exhaustion requirement and procedural default doctrine are both related to comity concerns that the State first be presented with the opportunity to rule on any federal constitutional issues that implicate the validity of a conviction.

> State courts, like federal courts, are obliged to enforce federal law. Comity thus dictates that when a prisoner alleges that his continued confinement for a state court conviction violates federal law, the state courts should have the first opportunity to review this claim and provide any necessary relief. . . . This rule of comity reduces friction between the state and federal court systems by avoiding the "unseem[liness]" of a federal district court's overturning a state court conviction without the state courts having had an opportunity to correct the constitutional violation in the first instance.

*O'Sullivan v. Boerckel,* 526 U.S. 838, 844-45 (1999) (citations omitted). Similarly,

> The procedural default doctrine and its attendant "cause and prejudice" standard are "grounded in concerns of comity and federalism," . . . and apply alike whether the default in question occurred at trial, on appeal, or on state collateral attack . . . .
> "[A] habeas petitioner who has failed to meet the State's procedural

---

[4] Unless otherwise noted, all citations to exhibits are those attached to the Answer.

requirements for presenting his federal claims has deprived the state courts of an opportunity to address those claims in the first instance." . . . We therefore require a prisoner to demonstrate cause for his state-court default of any federal claim, and prejudice therefrom, before the federal habeas court will consider the merits of that claim. . . . The one exception to that rule . . . is the circumstance in which the habeas petitioner can demonstrate a sufficient probability that our failure to review his federal claim will result in a fundamental miscarriage of justice.

*Edwards v. Carpenter,* 529 U.S. 446, 451 (2000) (citations omitted).

Defendant timely filed his federal petition[5] where, construing the petition liberally, he raises six claims including a multifaceted ineffective assistance of counsel claim. The claims fall into two different procedural history categories, each of which results in different consequences for whether and/or how the claims are analyzed under AEDPA.

---

[5] The New Mexico Supreme Court denied the petition for certiorari on August 30, 2000. *Exh. K.* However, before the expiration of the ninety-day deadline within which to petition the United States Supreme Court, on October 18, 2000, Defendant filed a timely *pro se* motion to reconsider his sentence under NM Rule 5-801. *Exh. L.* Since this motion was never ruled on, it tolled the one-year limitations period for ninety days:

> we disagree with the magistrate judge and district court that [Petitioner's] motion [under 5-801] is not a means of post-conviction review or collateral attack merely because (1) no state court ruled on the motion, or (2) [Petitioner] sought a reduction of his sentence, rather than a challenge to his conviction. First, under Rule 5-801, the motion was deemed denied after ninety days. Second, we find no authority limiting "post conviction or other collateral review" of a "judgment or claim" under § 2244(d)(2) to only challenges of a conviction, and not a sentence. Thus, because [Petitioner's] motion for modification of his sentence tolled the limitation period for ninety days, he timely filed his federal habeas petition at issue in this appeal.

*See Truelove v. Smith,* 9 Fed.Appx. 798, 802, 2001 WL 491143 *3 (10th Cir. 2001). Within the ninety-day period during which his motion to reconsider was pending, Vallejos also filed his *pro se* state habeas petition on December 28, 2000. Because these filing continuously tolled the one-year AEDPA limitations period, the statute did not begin to run until the state habeas proceedings concluded on February 27, 2001. The federal petition was filed within one year of that date, on February 11, 2002. *See Doc. 1.*

### A. Failure To Petition N.M. Supreme Court Following State Habeas Review

The first category of claims are those that were never presented to the New Mexico Supreme Court following state habeas review.  Claims 1 through 4 in this category originated on direct review:

1. The trial court erroneously allowed Sedillo's attorney and mother to testify over defense counsel's objection that they were not timely disclosed as witnesses;

2. Insufficient evidence as to all charges not reversed on appeal;

3. Judge Sanchez failure to recuse himself *sua sponte* because he presided of Hurtado's bank shooting trial; and

4. Mr. Eichwald should have disqualified himself because he represented Hurtado in the bank shooting trial.

Each of these issues was raised by trial counsel in the docketing statement and denied in the proposed summary affirmance by New Mexico Court of Appeals Judge M. Christina Armijo, who is now a federal judge in this district.  *See Exh. B* at 11; *Exh. C* at 2-5.

Yet one of the four claims was specifically abandoned by trial counsel in his memorandum in opposition to the proposed summary affirmance, and all of these claims were waived by the appellate public defender because she failed to raise them in her brief-in-chief or in her petition to the New Mexico Supreme Court.[6]  *See Maes v. Thomas,* 46 F.3d 979, 986 (10th Cir.) ("New

---

[6] Claim 1 was  preserved in the memorandum in opposition, *Exh. D* at 2-5, but raised as confrontation clause issue in brief-in-chief, *Exh. F* at  12-15.  The State responded that failure to raise the issue as a constitutional claim before the trial judge constituted a waiver, *Exh. G* at 8, and Defendant's appellate attorney did not reply to this argument, see *Exh. H*.  The New Mexico Court of Appeals found the constitutional argument waived and only addressed the issue as one of state law error, *Exh. I* at 17.  The only issues raised in the petition for certiorari were three double jeopardy issues.  *See Exh. J.*

Claim 2 was preserved in memorandum in opposition, but added double jeopardy arguments.  *Exh. D* at 5.  The brief-in-chief raised only the double jeopardy arguments.  *Exh. F* at 7-11.  The Court of Appeals did address sufficiency as to conspiracy counts and reversed on that charge.  *See Exh. I* at 1.  Again, only double jeopardy arguments were raised in the petition for certiorari.  *See Exh. J.*

Mexico courts have consistently applied the rule that deems all issues abandoned that are not raised in an appellant's brief-in-chief"), *cert. denied,* 514 U.S. 1115 (1995); *State v. Javier M.,* 131 N.M. 1, ___ 33 P.3d 1, ____ (N.M. 2001) ("Rule 12-502(C)(2) NMRA 2001 states that 'only the questions set forth in the petition will be considered by the Court.'" In *Javier M.,* the court addressed an issue not raised in petition because it was "foundational" to the one presented).

Despite the waivers on direct appeal, all four of the issues were momentarily resurrected under the auspices of an ineffective assistance of counsel claim in Vallejos' *pro se* state habeas petition,[7] The trial judge did not rely on a procedural default in his summary denial of the claims on the merits.[8] By addressing the four resurrected issues on the merits, they are not procedurally defaulted because there is no "independent" basis for the default. *See, e.g., Ylst v. Nunnemaker,* 501 U.S. 797, 803-04 (1991); *Klein v. Neal,* 45 F.3d 1395, 1398-99 (10th Cir. 1995); *Vernon v. Williams,* 208 F.3d 228, 2000 WL 286157 (10th Cir.), *cert. denied,* 531 U.S. 1039 (2000).

---

Claim 3 preserved in memorandum in opposition, *Exh. D* at 6, but was abandoned in the brief-in-chief, *see Exh. F.* The Court of Appeals did not address the issue, *see Exh. I;* and it was not raised in the petition for certiorari, *see Exh. J.*

Claim 4 was expressly abandoned in memorandum in opposition, *Exh. D* at 7, and it was not raised in the brief-in-chief, s*ee Exh. F.* Again, the Court of Appeals did not address the issue, *see Exh. I;* and the issue was not raised in the petition for certiorari, *see Exh. J.*

[7]  *C.f., Wiggins v. Moriarty,* 145 F.3d 1347, 1998 WL 244028 (10th Cir. 1998) ("the district court determined that appellant had failed to exhaust his fourth issue, which concerns the improper influence of newspaper articles on the sentencing process. Appellant raised the issue on direct appeal, but abandoned it on certiorari, and did not renew it in his subsequent habeas petition.").

[8]  The trial judge ordered a response to the petition. In that response, the State argued that an ineffective assistance of counsel claim could have been raised on direct appeal and, because Vallejos did not argue attorney ineffectiveness on appeal, the claim was waived. *Exh. O* at 2. In his summary denial, the trial judge did not rely on a waiver or incorporate the State's reasoning by reference. *Exh. P.* His reasoning in full is "that the allegations concerning ineffective assistance of counsel and all other grounds raised are without merit." *Id.*

Defendant also raised six additional ineffectiveness issues in his state habeas petition. Specifically, he contended that trial counsel was ineffective in:

a.    failing to have  to have Judge Sanchez recuse;
b.    raising  weak objections to late disclosure of witnesses;
c.    failing to take interlocutory appeal when the witnesses were permitted to testify;
d.    failing to subpoena Sedillo's "prison records" to impeach him;
e.    failing to conduct "background check" of Alvarado to impeach her; and
f.    "doing nothing" to counter state's evidence.

*See Exh. M.*   If the inquiry were to stop here, all of these issues would be before me for a decision in the posture of ineffective assistance of counsel analysis.[9]  And, because the denial of the state habeas opinion was summary, I would be obliged to analyze the claims independently. *See Battenfield v. Gibson,* 236 F. 3d 1215, 1220 (10th Cir. 2001); *Aycox v. Lytle,* 196 F. 3d 1174, 1177-78 (10th Cir. 1999).

However, Petitioner failed to file a petition for certiorari with the New Mexico Supreme Court from the denial of his state habeas petition.  Because that habeas petition was denied on February 27, 2001, Defendant had thirty days, or until March 29, 2001, to file a petition for certiorari to the New Mexico Supreme Court under Rule 12-501(B).  Since Vallejos did not seek certiorari within that time frame, my inquiry is whether he has procedurally defaulted the claims rather than whether he failed to exhaust them.  *E.g., O'Sullivan v. Boerckel,* 526 U.S. 838, 848 (1999); *Thomas v. Gibson,* 281 F.3d 1213, 1221 (10th Cir. 2000); *Ogden v. Bravo,* 35 Fed.Appx.

_____

[9]  As a practical matter, however, in analyzing what counsel allegedly "failed" to raise or accomplish, I would still have to look at the merits of the four issues as initially presented on direct appeal.  *See Dennis v. Poppel,* 222 F.3d 1245, 1261 (10th Cir. 2000) ("Having reviewed Mr. Dennis' underlying constitutional claims raised in his habeas corpus petition, we conclude that although novel, each lacks merit.  In so concluding, it follows Mr. Dennis' counsel's failure to raise these meritless claims at trial or on direct appeal did not prejudice Mr. Dennis' case."), *cert. denied,* 122 S.Ct. 199 (2001).

722, 726, 2002 WL 102639 (10th Cir. 2002) (in context of failure to comply with Rule 12-501(B)).

### B.  Failure To Present Issues To State Court On Habeas Review

The second category of claims includes an ineffective assistance of counsel claim that is entirely unexhausted and one claim from direct appeal that was not resurrected in the state habeas proceedings.  Vallejos asserts that his trial attorney was ineffective in advising him not to testify. This argument has never been raised in any of the state proceedings.  He also maintains that his sentence is disproportionate to that received by Sedillo.  Although this argument was raised on direct appeal in the docketing statement and denied in the summary affirmance, it was specifically abandoned in the memorandum in opposition, not raised in the brief-in-chief, not addressed by the Court of Appeals, not raised in the petition for certiorari from the direct appeal, and not resurrected in the state habeas petition.  *See Exh. B* at 11; *Exh. C* at 6; *Exh. D* at 7; *see also Exhs. F, I, J, M.*  Thus, the issue is whether there are any additional avenues for Petitioner to pursue in the state court.  There are not.

"New Mexico state courts will not consider any issues raised in a second post-conviction proceeding which could have been raised in the first proceeding."  *Harris v. Williams,* 5 Fed. Appx. 831, 2001 WL 201962 (10th Cir. 2001).  The "narrow exception to this New Mexico waiver rule [is] when the petitioner asserts 'fundamental error' in his trial."  *Id.* (citing *State v. Gilliahan,* 86 N.M. 439, 524 P.2d 1335, 1336 (N.M. 1974)).  The New Mexico Supreme Court recently noted that the

> doctrine of fundamental error should be applied sparingly, to
> prevent a miscarriage of justice, and not to excuse the failure to
> make proper objections in the court below.  With regard to a
> criminal conviction, the doctrine is resorted to only if the
> defendant's innocence appears indisputable or if the question of his

> [or her] guilt is so doubtful that it would shock the conscience to
> permit the conviction to stand. . . . "If there is substantial evidence
> . . . to support the verdict of the jury, we will not resort to
> fundamental error."

*State v. Reyes,* 52 P.3d 948, 962, 2002-NMSC-024 (N.M. 7/24/02) (citations and original

material omitted). After having carefully reviewed the entire state court record, I find Petitioner

unable to meet this fundamental error standard for the reasons set forth below. Accordingly,

Petitioner has no further avenues of exhaustion in the state courts and this category of claims is

procedurally defaulted as well.

### III. Analysis

"A federal court may proceed to the merits of a procedurally defaulted habeas claim if the

petitioner establishes either cause for the default and actual prejudice or a fundamental

miscarriage of justice if the merits of the claim are not reached." *Demarest v. Price,* 130 F.3d 922,

942 (10th Cir. 1997); *see also e.g., Johnson v. Champion,* 288 F.3d 1215, 1217 (10th Cir. 2002).

"The determination of cause and prejudice and of fundamental miscarriage of justice are both

matters of federal law." *Demarest,* 130 F.3d at 942.

### A. Cause Has Been Established Because Record Evidences An External Factor For Failing To Petition For Certiorari

To establish cause, Vallejos must set forth a factor "external" to him that caused him to

miss the filing deadline for the petition for certiorari. *E.g., Murray v. Carrier,* 477 U.S. 478, 489

(1984). Recently, the Tenth Circuit has held that "the clerk's failure to mail [Petitioner] a

certified copy of the court's order and the difficulties he faced in obtaining such a copy within a

tight time-frame, are compelling" and satisfied the cause requirement. *Johnson,* 288 F.3d at 1218.

The same situation is established here.

In his federal habeas petition, Vallejos indicates that he did not petition for certiorari "because I never received a decision from the District Court until I filed a writ of mandamus" and "was not served with a decision on my habeas corpus timely." *Doc. 1* at 4-5. He also attached a notarized letter from his sister to the federal petition. It is dated December 1, 2001 and states that she called the courthouse in January, February, and March of 2001 and was told the court had not issued a decision. *Id.,* Exh. A.

The record further confirms that, at the very least, there was confusion about the status of the decision as the order denying the petition. For example, after the order denying relief was entered on February 27, 2001, Petitioner filed a response to the State's court-ordered response on March 6, 2001. The State filed a reply to this pleading on March 7, 2001 or eight days ***after*** the order denying relief was entered. *Exhs. P-R.* The next pleading in the record is Petitioner's November 2001 petition for a writ of mandamus indicating that there had been no decision on his state petition and that he wanted "to take my case to a higher court if necessary." *Exh. S.* Accordingly, I find the Petitioner has established the "cause" prong of the inquiry.

### B. Prejudice

To satisfy the prejudice prong of the inquiry, Petitioner must show "actual prejudice." The Supreme Court has not precisely defined that phrase, but the Tenth Circuit has examined and determined how to evaluate the prejudice prong.

> Complicating this cause-and-prejudice inquiry is the fact that the Supreme Court has never "attempted to establish conclusively the contours of the standard." *Amadeo v. Zant,* 486 U.S. 214, 221 (1988); *see also Reed v. Ross,* 468 U.S. 1, 13 (1984) (Court has provided no "precise content" defining "cause"); *United States v. Frady,* 456 U.S. 152, 168 (1982) (exact understanding of "prejudice" remains "open question" in most contexts).

> Nevertheless, certain general guidelines have emerged from the Court's jurisprudence.
>
> * * * * *
>
> The burden of showing prejudice is not an easy one. As a rule, the petitioner "must shoulder the burden of showing, not merely that the errors at his trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." [*Frady*, 456 U.S. at 170]. In other words, it is not enough to assert that an error "might have changed the outcome of the trial." *Strickler v. Greene,* 527 U.S. 263, 289 (1999). ***Instead, a petitioner "must convince [a court] that 'there is a reasonable probability' that the result of the trial would have been different."*** *Id.* at 289-91 (explaining lower court wrong to consider 'possibility' rather than 'probability'). This "reasonable probability" standard does not require that a petitioner demonstrate he "would more likely than not have received a different verdict" without the claimed error. *Id.* at 289. Rather, the question is ***whether, considering the error, "he received a fair trial, understood as a trial resulting in a verdict worthy of confidence."*** *Id.* at 290. Applying these standards, we have concluded a petitioner did not establish prejudice where the jury did not consider newly required elements of a crime but its verdict 'necessarily embraced the missing elements.' United *States v. McDonald,* 150 F.3d 1301, 1304 (10th Cir. 1998).

*Daniels v. United States,* 254 F.3d 1180, 1190-91 (10th Cir. 2001); *see also United States v. Bailey,* 286 F.3d 1219, * (10th Cir. 2002) ("'Actual prejudice' means 'not merely that the errors at . . . trial created a possibility of prejudice, but that they worked to [defendant's] actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions.'"), *petition for cert. filed 6/21/01; Ivy v. Caspari,* 173 F.3d 1136 , 1141 (8th Cir. 1999) (same); *Hudson v. Whitley,* 979 F.2d 1058, 1065(5th Cir. 1992) (same); *Hollis v. Davis,* 941 F.2d 1471, 1480 (11th Cir. 1991) (same), *cert. denied,* 503 U.S. 938 (1992).

Aside from the allegations of conflict and disproportionate sentence, taken as a whole, all of Petitioner's claims go to the sufficiency of the evidence against him. I will assume for the

purposes of argument that Alvarado and Sedillo's attorney did not testify and that defense counsel introduced Castillo's prison records. Nevertheless, I am unconvinced that there is a reasonable probability that the result of the trial would have been different because the testimony of Castillo and Saiz was sufficient to convict him under applicable constitutional standards.[10]

Saiz set forth the history of the feud, identified Vallejos as the shooter during the bank incident, and gave a plausible explanation for her failure to identify him at the earlier trial. Castillo testified to Vallejos' desire for revenge after Hurtado was shot as well as Vallejos' direct involvement in the Saiz shooting. Castillo testified about his own involvement in the Saiz shooting, as well as his lengthy history of chronic drug and alcohol abuse, his desire to reunite with his family and his minimal sentence.

The basis for questioning whether Castillo was telling the truth was obvious, and explored by trial counsel. Even assuming Castillo had "prison records" other than the Saiz shooting, they would have added little to the obvious credibility questions Castillo posed as a witness. Counsel introduced doubt by establishing that someone else had been looking for Saiz before the shooting and drove a car that did not even remotely resemble Defendant's truck. However, the jury credited Saiz' and Castillo's testimony and that testimony is sufficient to support the convictions.

I am also confident that Vallejos received a fair trial notwithstanding his claims of conflict. State standards and federal statutory standards governing recusal are not conclusive of whether federal due process has been violated, but do aid in the analysis. *See Mann v. Thalacker,* 246

_____

[10] That is, after viewing all of the evidence "in the light most favorable to the prosecution, ***any*** rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319 (1979) (emphasis original); *see also Wright,* 2000 WL at *1. The court can neither reweigh the evidence nor substitute its judgment for that of the jury. *E.g., Wingfield v. Massie,* 122 F.3d 1329, 1332 (10th Cir. 1997), *cert. denied,* 523 U.S. 1005 (1998).

F.3d 1092, 1096 (8th Cir.), *cert. denied,* 122 S. Ct. 541 (2001); *Fero v. Kerby,* 39 F.3d 1462, 1480 (10th Cir. 1994), *cert. denied,* 515 U.S. 1122 (1995). Mere appearance of bias is insufficient to establish a federal constitutional violation. A defendant must show either actual bias or that circumstances surrounding his trial "were such that the incentive to be biased was sufficiently strong to overcome the presumption of judicial integrity." *Fero,* 39 F.3d at 1479; *see also id.* at 1478; *see also Del Vechhio v. Illinois Dept. of Corrections,* 31 F.3d 1363, 1372-73 (7th Cir. 1994) (en banc), *cert. denied,* 514 U.S. 1037 (1995). "'Only a strong, direct interest in the outcome of a case is sufficient to overcome that presumption of evenhandedness.'" *Fero,* 39 F.3d at 1479 (quoting *Del Vechhio,* 31 F.3d at 1373); *see also Davis v. LeMaster,* 2000 WL 702408 (10th Cir. 2000) (same). [11]

   Neither knowledge of Saiz's accusations from a prior judicial proceeding nor adverse rulings are sufficient to create a presumption of judicial bias. *See e.g., Nichols v. Sullivan,* 867 F.2d 1250, 1254 (10th Cir.) (trial judge's observation that it was "impossible" to "divorce" pretrial and trial proceedings from sentencing proceedings does not show actual bias or overcome presumption), *cert. denied,* 490 U.S. 1112 (1989); *McChristion v. Hood,* 551 F. Supp. 1001 (D.Ind.1982) (and decisions cited therein re: involvement in other judicial proceedings); *Traylor v. Gibson,* 2000 WL 16328 (10th Cir. 2000) ("adverse judicial rulings, standing alone, do not constitute a valid basis for recusal based on bias or partiality. *See Liteky v. United States,* 510

---

[11]   For example, the Supreme Court has identified a judge's "'pecuniary interest in the outcome'" and where the judge "'has been the target of personal abuse or criticisms from the party before him'" as sufficient. *Fero,* 39 F.3d at 1479 (quoting *Withrow v. Larkin,* 421 U.S. 35, 47 (1975)).

U.S. 540, 555 (1994).").[12]

Defendant made no objection to Eichwald being appointed as his attorney. Indeed, despite advance knowledge that there was a possibility of a conflict, Vallejos' attorney of choice was his son's former attorney and the trial judge, intentionally or not, acceded to that preference. Moreover, nothing in the record establishes that Eichwald was jointly representing conflicting interests during his representation of Vallejos. *See e.g, Mickens v. Taylor,* ___ U.S. ___, 122 S. Ct. 1237, 1241-44 (2002); *United States v. Cook,* 45 F.2d 388, 393 (10th Cir. 1995). For all of these reasons, I find that Petitioner fails to establish actual prejudice.

### C. Fundamental Miscarriage of Justice

Similar to the New Mexico standard, the federal fundamental miscarriage of justice exception applies only when a petitioner "'supplements his constitutional claim with a colorable showing of factual innocence.'" *Herrera v. Collins,* 506 U.S. 390, 404 (1993) (quoting *Kuhlmann v. Wilson,* 477 U.S. 436, 454 (1986)); *see also English v. Cody,* 146 F.3d 1257, 1259 (10th Cir. 1998). Petitioner fails to meet this very narrow exception either as a matter of federal or state law.

Wherefore,

**IT IS HEREBY RECOMMENDED** that all of the issues in the federal petition be found exhausted and procedurally defaulted and therefore, his petition be dismissed without further

---

[12] *See also Scott v. Tansy,* 1996 WL 174711 (10th Cir.) (affirmance noting that magistrate judge from this district concluded judge's failure to recuse where he presided over defendant's prior divorce failed to show bias or appearance of bias and that defendant's "speculation that the trial judge's prior knowledge gained from the uncontested divorce proceeding influence his rulings was not supported by any facts"), *cert. denied,* 519 U.S. 883 (1996).

consideration of his claims.

**IT IS FURTHER ORDERED** that because this court has raised the issue of procedural default *sua sponte,* that Petitioner be given additional time, until October 31, 2002, to file objections and to respond to the proposed findings.

> **THE PARTIES ARE FURTHER NOTIFIED THAT a party must file any objections with the Clerk of the District Court within if that party wants to have appellate review of the proposed findings and recommended disposition. If no objections are filed, no appellate review will be allowed.**

_____
UNITED STATES MAGISTRATE JUDGE